**No. 21-13489**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

DREAM DEFENDERS, THE BLACK COLLECTIVE INC., CHAINLESS
CHANGE INC., BLACK LIVES MATTER ALLIANCE BROWARD,
FLORIDA STATE CONFERENCE OF THE NAACP, ET AL.,

*Plaintiffs-Appellees*,

v.

GOVERNOR OF THE STATE OF FLORIDA, SHERIFF OF
JACKSONVILLE/DUVAL COUNTY OF FLORIDA,

*Defendants-Appellants.*

ATTORNEY GENERAL, STATE OF FLORIDA, ET AL.

*Defendants*

On Appeal from the United States District Court for the
Northern District of Florida
Case No. 4:21-cv-00191-MW-MAF

## RESPONSE BRIEF OF PLAINTIFFS-APPELLEES

Georgina C. Yeomans (*pro hac vice*)
Jason P. Bailey (*pro hac vice*)
Anuja Thatte
NAACP LEGAL DEFENSE AND
 EDUCATIONAL FUND, INC.
709 14th Street NW, Suite 600
Washington, DC 20005

Sherrilyn A. Ifill
Samuel Spital
Rachel M. Kleinman
Morenike Fajana (*pro hac vice*)
NAACP LEGAL DEFENSE AND
 EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

Miriam Haskell
COMMUNITY JUSTICE PROJECT, INC.
3000 Biscayne Blvd. Ste 106
Miami, FL 33137

James E. Tysse
Pratik A. Shah
Steven H. Schulman
Caroline L. Wolverton
Juliana C. DeVries
AKIN GUMP STRAUSS HAUER &
 FELD LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000
jtysse@akingump.com

Daniel B. Tilley
Nicholas Warren
ACLU OF FLORIDA
4343 W. Flagler Street, Suite 400
Miami, FL 33134

*Counsel for Plaintiffs-Appellees*
*(Additional Counsel Listed on Inside Cover)*

Nicholas E. Petree
AKIN GUMP STRAUSS HAUER &
  FELD LLP
1111 Louisiana Street, 44th Floor
Houston, TX 77002

Pranav Lokin
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201

Joseph L. Sorkin
Anne M. Evans
Christopher J. Gessner
Erica E. Holland
Evan D.T. Frohman
Thomas V. Napoli
Jennifer J. Yu
AKIN GUMP STRAUSS HAUER &
  FELD LLP
One Bryant Park, 44th Floor
New York, NY 10036

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 26.1-2, the following persons have or may have an interest in the outcome of this case or appeal, in addition to those listed in Defendants-Appellants' certificates:

1.    DeVries, Juliana

2.    Frohman, Evan

3.    Gessner, Christopher

4.    Ifill, Sherrilyn

5.    Lokin, Pranav

6.    Napoli, Thomas

7.    Spital, Samuel

8.    Thatte, Anuja

9.    Yu, Jennifer

Counsel for appellees certify that Plaintiffs-Appellees The Dream Defenders, The Black Collective, Inc., Chainless Change, Black Lives Matter Alliance Broward, Florida State Conference of The NAACP Branches and Youth Units ("Florida NAACP"), and Northside Coalition of Jacksonville, Inc. have no parent corporations or any other publicly

held corporations that own 10% or more of their stock.  Florida NAACP

is a state conference of branches of the national NAACP.

## STATEMENT REGARDING ORAL ARGUMENT

The Court has calendared oral argument for March 17, 2022.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF ISSUES.................................................................... 1

INTRODUCTION ................................................................................ 2

STATEMENT OF THE CASE ............................................................. 5

    I.    FACTUAL BACKGROUND............................................... 5

        A.    HB1's Passage .......................................................... 5

        B.    HB1's Provisions ...................................................... 9

        C.    Plaintiffs And Their Members ................................. 10

    II.    PROCEDURAL HISTORY................................................ 14

STANDARD OF REVIEW................................................................... 18

SUMMARY OF THE ARGUMENT ..................................................... 19

ARGUMENT ..................................................................................... 21

    I.    PLAINTIFFS HAVE STANDING ....................................... 21

        A.    Plaintiffs Have Suffered Two Types Of Injury-In-Fact ............................................................................ 22

            1.    *Plaintiffs Have Standing To Sue Both In Their Own Right And On Behalf Of Their Members* ........................................................ 22

            2.    *Defendants' Contrary Arguments Are Unavailing* ........................................................ 27

        B.    Plaintiffs Have Established Causation And Redress ...................................................................... 30

    II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN GRANTING THE PRELIMINARY INJUNCTION ................................................................. 36

        A.    Plaintiffs Are Likely To Succeed On The Merits......... 37

            1.    *The Statute Is Vague* ........................................... 38

                a.    Legal Standard ......................................... 38

|        | b.   | Section 15 Fails To Define What Conduct It Prohibits And Encourages Arbitrary Enforcement | 41 |
|        | c.   | Defendants Fail To Offer Any Reasonable And Readily Apparent Constitutional Reading | 49 |
|        | 2.   | *The Statute Is Overbroad* | 58 |
| B.     | Without Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm | | 61 |
| C.     | The Harm To Plaintiffs Outweighs Any Harm To Defendants, And The Injunction Is In The Public Interest | | 63 |
| D.     | The District Court Did Not Otherwise Abuse Its Discretion In Granting An Injunction | | 65 |

CONCLUSION ............................................................................ 68

ADDENDUM

   FLA. STAT. § 870.01 ...................................................... Add. 1

# TABLE OF CITATIONS

<u>C</u>ASES:

*A.C.L.U. of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.,*
    557 F.3d 1177 (11th Cir. 2009) ........................................................ 22

*A.C.L.U. v. Florida Bar,*
    999 F.2d 1486 (11th Cir. 1993) ............................................. 24, 28, 36

*Arcia v. Florida Sec'y of State,*
    772 F.3d 1335 (11th Cir. 2014) ................................................... 22, 24

*Ashcroft v. Free Speech Coal.,*
    535 U.S. 234 (2002) ...................................................................... 38, 56

*Autauga Cnty. Emergency Mgmt. Commc'n Dist. v. F.C.C.,*
    17 F.4th 88 (11th Cir. 2021) ................................................................ 45

*Ayala v. Scott,*
    224 So. 3d 755 (Fla. 2017) ................................................................. 32

*Babbitt v. Sweet Home Chapter of Communities for a Great
    Or.,*
    515 U.S. 687 (1995) ............................................................................ 57

*\*Baggett v. Bullitt,*
    377 U.S. 360 (1964) ............................................................. 39, 66, 67

*Bankshot Billiards, Inc. v. City of Ocala,*
    634 F.3d 1340 (11th Cir. 2011) .......................................................... 38

*Barnhart v. Thomas,*
    540 U.S. 20 (2003) .............................................................................. 44

*Bonner v. City of Prichard,*
    661 F.2d 1206 (11th Cir. 1981) .......................................................... 26

*\*Boos v. Barr,*
    485 U.S. 312 (1988) ............................................................................ 39

_____

\* Authorities chiefly relied upon are marked with an asterisk.

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969)...............................................................59

*Brown v. Entertainment Merchs. Ass'n,*
    564 U.S. 786 (2011)...............................................................67

*Brown v. United States,*
    720 F.3d 1316 (11th Cir. 2013)............................................35

*CISPES v. F.B.I.,*
    770 F.2d 468 (5th Cir. 1985)................................................55

*Citizens United v. F.E.C.,*
    558 U.S. 310 (2010)...............................................................65

*City of Houston v. Hill,*
    482 U.S. 451 (1987).....................................................37, 66, 67

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)..........................................................29, 30, 33

*Clark v. Martinez,*
    543 U.S. 371 (2005)...............................................................41

*Coates v. City of Cincinnati,*
    402 U.S. 611 (1971).........................................................39, 60

*Colorado River Water Conservation Dist. v. United States,*
    424 U.S. 800 (1976)........................................................65, 66

*County of Allegheny v. Frank Mashuda Co.,*
    360 U.S. 185 (1959)........................................................66, 67

*Cramp v. Board of Pub. Instruction of Orange Cnty.,*
    368 U.S. 278 (1961)...............................................................39

*Dakota Rural Action v. Noem,*
    416 F. Supp. 3d 874 (D.S.D. 2019) .....................................46

*Dimmitt v. City of Clearwater,*
    985 F.2d 1565 (11th Cir. 1993)............................................40

*Dombrowski v. Pfister,*
  380 U.S. 479 (1965) ................................................................ 66, 67

*Edwards v. Thomas,*
  229 So. 3d 277 (Fla. 2017) ............................................................ 48

*Elfbrandt v. Russell,*
  384 U.S. 11 (1966) ........................................................................ 61

*England v. Louisiana State Bd. of Med. Exam'rs,*
  375 U.S. 411 (1964) ...................................................................... 65

*Ex parte Young,*
  209 U.S. 123 (1908) ................................................................ 35, 36

*F.T.C. v. Mandel Brothers, Inc.,*
  359 U.S. 385 (1959) ...................................................................... 53

*Facebook, Inc. v. Duguid,*
  141 S. Ct. 1163 (2021) .................................................................. 53

*Fields v. Rockdale Cnty. Ga.,*
  785 F.2d 1558 (11th Cir. 1986) .................................................... 67

*Florida Med. Ass'n v. United States Dep't of Health, Educ. &
  Welfare,*
  601 F.2d 199 (5th Cir. 1979) ........................................................ 37

*Florida Right to Life, Inc. v. Lamar,*
  273 F.3d 1318 (11th Cir. 2001) .................................................... 40

*Gay Lesbian Bisexual All. v. Pryor,*
  110 F.3d 1543 (11th Cir. 1997) ................................................ 40, 55

*Georgia Latino All. for Hum. Rts. v. Governor of Ga.,*
  691 F.3d 1250 (11th Cir. 2012) .................................................... 22

*Goldberg v. Companion Life Ins. Co.,*
  910 F. Supp. 2d 1350 (M.D. Fla. 2012) ...................................... 54

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ................................................................ 39, 40

vi

*Greater Birmingham Ministries v. Secretary of State of Ala.*,
992 F.3d 1299 (11th Cir. 2021) ............................................................ 23

*Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*,
922 F.2d 756 (11th Cir. 1991) .............................................................. 25

*Harrell v. Florida Bar*,
608 F.3d 1241 (11th Cir. 2010) ............................................. 24, 27, 28

*Hill v. Colorado*,
530 U.S. 703 (2000) .............................................................................. 41

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .................................................................................. 56

*Ideal Indus., Inc. v. Gardner Bender, Inc.*,
612 F.2d 1018 (7th Cir. 1979) .............................................................. 62

*International Soc'y for Krishna Consciousness of Atlanta v. Eaves*,
601 F.2d 809 (5th Cir. 1979) ................................................................ 26

*Israel v. DeSantis*,
No. 4:19-cv-576, 2020 WL 2129450 (N.D. Fla. May 5, 2020) ............................................................................................... 32

*\*KH Outdoor, LLC v. City of Trussville*,
458 F.3d. 1261 (11th Cir. 2006) ..................................................... 61, 63

*Legacy Entertainment Arts Foundation, Inc. v. Mina*,
No. 6:21-cv-698-PGB-DCI, 2021 WL 4444688 (M.D. Fla. Aug. 20, 2021) .................................................................................... 57

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .............................................................................. 33

*Lockhart v. United States*,
577 U.S. 347 (2016) .............................................................................. 52

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .......................................................... 21

*Maryland v. King,*
  567 U.S. 1301 (2012) ........................................................ 64

*Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.,*
  14 F.3d 1507 (11th Cir. 1994) .......................................... 19

*Moody v. Holman,*
  887 F.3d 1281 (11th Cir. 2018) ................................... 27, 34

*MSPA Claims 1, LLC v. Tenet Fla., Inc.,*
  918 F.3d 1312 (11th Cir. 2019) ........................................ 54

*\*N.A.A.C.P. v. Button,*
  371 U.S. 415 (1963) ................................... 39, 49, 55, 58

*N.A.A.C.P. v. Claiborne Hardware Co.,*
  458 U.S. 886 (1982) .......................................................... 61

*Near v. State of Minn. ex rel. Olson,*
  283 U.S. 697 (1931) .......................................................... 37

*New Hampshire Right to Life Pol. Action Comm. v. Gardner,*
  99 F.3d 8 (1st Cir. 1996) .................................................. 26

*Odebrecht Constr., Inc. v. Secretary Fla. Dep't of Transp.,*
  715 F.3d 1268 (11th Cir. 2013) ................................... 63, 64

*Oklahoma State Conf. of the N.A.A.C.P. v. O'Connor,*
  No. CIV-21-859-C, --- F. Supp. 3d ---, 2021 WL 4992754
  (W.D. Okla. Oct. 27, 2021), *appeal docketed*, No. 21-6156
  (10th Cir. Nov. 29, 2021) .................................................. 45

*Parm v. National Bank of Cal., N.A.,*
  835 F.3d 1331 (11th Cir. 2016) ........................................ 54

*Pine v. City of West Palm Beach,*
  762 F.3d 1262 (11th Cir. 2014) ........................................ 41

*Polite v. State*,
  973 So. 2d 1107 (Fla. 2007) ............................................................... 56

*Quarantello v. Leroy*,
  977 So. 2d 648 (Fla. Dist. Ct. App. 2008) ......................................... 48

*Reproductive Health Servs. v. Strange*,
  3 F.4th 1240 (11th Cir. 2021) ............................................................ 30

*RoDa Drilling Co. v. Siegal*,
  552 F.3d 1203 (10th Cir. 2009) .......................................................... 63

*S.E.C. v. Unique Fin. Concepts, Inc.*,
  196 F.3d 1195 (11th Cir. 1999) .................................................... 18, 21

*Sapuppo v. Allstate Floridian Ins. Co.*,
  739 F.3d 678 (11th Cir. 2014) ........................................................... 36

*Scott v. Roberts*,
  612 F.3d 1279 (11th Cir. 2010) .......................................................... 64

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018) ........................................................................ 49

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) .......................................................... 37

*Smith v. City of Cumming*,
  212 F.3d 1332 (11th Cir. 2000) .......................................................... 59

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) .............................................................. 28

*State v. Beasley*,
  317 So. 2d 750 (Fla. 1975) ....................................................... 9, 47, 48

*State v. Dorsett*,
  158 So. 3d 557 (Fla. 2015) ........................................................... 42, 51

*Stenberg v. Carhart*,
  530 U.S. 914 (2000) ...................................................................... 40, 67

*Support Working Animals, Inc. v. Governor of Fla.*,
  8 F.4th 1198 (11th Cir. 2021) ...................................................... 30, 33

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ............................................................. 24, 27, 30

*Sweat v. Waldon*,
  167 So. 363 (Fla. 1936) ...................................................... 35

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) ........................................ 64

*United States v. Cook*,
  84 U.S. 168 (1872) .............................................................. 56

*United States v. Davis*,
  139 S. Ct. 2319 (2019) ....................................................... 38

*United States v. Gillis*,
  938 F.3d 1181 (11th Cir. 2019) ........................................ 54

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982) ............................................................ 58

*Virginia v. American Booksellers Ass'n*,
  484 U.S. 383 (1988) ............................................................ 27

*Virginia v. Hicks*,
  539 U.S. 113 (2003) ............................................................ 58

*West Ala. Women's Ctr. v. Williamson*,
  900 W.3d 1310, 1328 (11th Cir. 2018) ............................... 28

*Wilson v. State Bar of Ga.*,
  132 F.3d 1422 (11th Cir. 1998) ........................................ 26

**Wollschlaeger v. Governor, Fla.*,
  848 F.3d 1293 (11th Cir. 2017) .................................. *passim*

*Zwickler v. Koota*,
  389 U.S. 241 (1967) ............................................................ 66

## Constitution and Statutes:

Fla. Const. art. IV
§ 1(d)............................................................................................31
§ 7(a)............................................................................................32

U.S. Const.
amend. I .......................................................................................37

18 U.S.C.
§ 2101..........................................................................................51
§ 2102..........................................................................................51

28 U.S.C.
§ 1292(a)(1)...................................................................................1
§ 1331 ...........................................................................................1

Alaska Stat.
§ 11.61.100(a) ..............................................................................50

Del. Code Ann. tit. 11,
§ 1302 ..........................................................................................51

Fla. Stat.
§ 14.022 .......................................................................................31
§ 27.14(1) .....................................................................................32
§ 30.15 ..........................................................................................35
§ 166.241(4)(a).............................................................................10
§ 250.06 .......................................................................................31
§ 250.28 .......................................................................................31
§ 768.28(5)(b)..............................................................................10
§ 775.082(3)(e) ......................................................................10, 38
§ 775.084(4) .................................................................................38
§ 870.01 .......................................................................................31
*§ 870.01(2) ........................................................................ *passim*
*§ 870.01(6) ....................................................................10, 38, 49
§ 870.01(7) ...................................................................................55

Haw. Rev. Stat. Ann.
§ 711-1103(1)...............................................................................51

MODEL PENAL CODE

    § 2.02(8) ............................................................... 51

    § 250.1(1) .............................................................. 50

N.J. STAT. ANN.

    § 2C:33-1(a) .......................................................... 51

OHIO REV. CODE ANN.

    § 2917.03(A) ......................................................... 51

OKLA. STAT. ANN. tit. 21,

    § 1312 ................................................................... 51

18 PA. STAT. AND CONST. STAT. ANN.

    § 5501 ................................................................... 51

TENN. CODE ANN.

    § 39-17-301 .......................................................... 51

TEX. PENAL CODE ANN.

    § 42.02 ................................................................. 51

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY ....................................................... 51

Block, Emily, *Civil Rights Protests Are Part Of Jacksonville's Past—And Future*, FLORIDA TIMES-UNION (June 6, 2020) ................ 60

Chenoweth, Erica & Jeremy Pressman, *This Summer's Black Lives Matter Protesters Were Overwhelmingly Peaceful, Our Research Finds*, WASH. POST (Oct. 16, 2020).............. 59

*Hearing on: HB1 Combating Public Disorder Before H. Crim. Just. & Pub. Safety Subcomm.*, 2021 Leg. Sess. (Fl. 2021) (statements of Karen Woodall, Exec. Dir. & Co-Founder of Fl. Ctr. for Fiscal & Econ. Pol'y & Rep. Juan Fernandez-Barquin) .............................................................. 7, 46

*Hearing on: HB1 Combating Public Disorder Before the H. Judiciary Comm.*, 2021 Leg. Sess. (Fl. 2021) (statement of Rep. Learned, H. Judiciary Comm.).................................... 6, 7, 20, 46

*Hearing on: HB1 Combating Public Disorder Before the S. Comm. on Appropriations*, 2021 Leg (Fl. 2021) (statement of Rep. Gary Farmer, S. Comm. On Appropriations)......................... 8

Huack, Grace, *Cars Have Hit Demonstrators 104 Times Since George Floyd Protests Began*, USA TODAY (July 9, 2020)................................................................................... 59

Martin Luther King, Jr. Encyclopedia, STANFORD ................................ 60

News Release, Office of Gov. Ron DeSantis, *Gov. Ron DeSantis Reports That Florida Demonstrations Have Remained Largely Peaceful Over Past 24 Hours* (June 2, 2020)................................................................................... 32

Olding, Rachel, *Far-Right Boogaloo Admits Shooting Up Cop Station Amid Floyd Protests*................................................. 59

Scalia, Antonin & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .................................... 54

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

I.    Whether Plaintiffs have Article III standing to challenge Florida's amended rioting statute in light of the district court's findings that Plaintiffs and their members are directly harmed by the new law and that enjoining Defendants would redress those injuries.

II.    Whether the district court abused its discretion in granting a preliminary injunction after finding that: (a) the challenged state statute is unconstitutionally vague and overbroad, and not subject to a reasonable and readily apparent limiting construction; (b) Plaintiffs and their members are suffering irreparable harm through violation of their constitutional rights; and (c) the balance of equities and public interest strongly favor Plaintiffs.

1

## INTRODUCTION

In response to an unprecedented wave of civil rights and police accountability demonstrations occurring nationwide following the murder of George Floyd and others by law enforcement, Defendant Governor Ron DeSantis signed into law a controversial measure known as HB1 ("Combating Public Disorder"). Although Florida law has proscribed "rioting" for well over a century—and although the previous anti-riot law has been used to prosecute the small minority of protestors who engage in violence—DeSantis stated that increasing punishments and expanding liability was a necessary response to the recent protests. In fact, he touted HB1 as the "strongest anti-rioting, pro-law enforcement piece of legislation in the country."

Florida may punish those who engage in violent conduct, but it may not define the "riot" offense so vaguely or so broadly as to sweep in those exercising their core First Amendment rights to speak, assemble, and petition the government for redress of grievances. As history shows, such vague and overbroad laws chill protected expression and are readily weaponized to target disfavored groups in contravention of constitutional

rights. *See* Doc:137 at 1-3[1] (describing historical use of "anti-riot laws" to suppress integration and "activities threatening the state's Jim Crow status quo").

Defendants DeSantis and Jacksonville/Duval County Sheriff Mike Williams now argue that the Legislature actually intended to "protect" protestors by "codifying" (per Williams)—or perhaps "clarifying" (per DeSantis)—the prior definition of "riot," which was borrowed from the common law. But that dubious characterization is contradicted by the text, context, purpose, and history of the new law. True, the new law borrows, as a starting point, the common-law definition—*i.e.*, "an assembly of three or more persons, acting with common intent to assist each other in violent and disorderly conduct." But critically, it then inserts vague words that sweep in those who "participate[] in a violent public disturbance *involving*" such a common-law riotous assembly.

The Legislature thus expanded the scope of the crime to encompass not only the rioters themselves, but apparently anyone who participates in a larger assembly of which the rioters are a part. That vague language

---

[1] References to docket entries are abbreviated as "Doc:__ at __."

invites arbitrary and discriminatory enforcement by police, prosecutors, and judges, and fails to give ordinary people notice of what conduct will run afoul of the new law.  And another new provision only exacerbates those problems: Anyone arrested for rioting *must be held without bail* until brought before a judge.  That change (which Defendants' briefs ignore) threatens any protestor arrested for committing a "riot"— including someone arrested unconstitutionally—with the prospect of remaining in jail for hours or days.

The vague and overbroad new "riot" definition, along with increased penalties and mandatory custody, has severely harmed Plaintiff civil rights organizations, who have had to cancel demonstrations and divert resources from their core missions, and whose members have been forced to engage in dramatic self-censorship.  Although Plaintiffs welcome Defendants' position in this litigation that the law cannot be used to target innocent bystanders, those non-binding assurances fail to cure the constitutional harm.  Unlike Broward County, whose Sheriff has not appealed the injunction (and which elected not to enforce Section 15 due to civil rights concerns), Defendants have neither offered authoritative

guidance nor made any judicially enforceable commitment in support of their proffered interpretation.

As indicated by the district court's struggles to parse the new "riot" definition—not to mention the disagreement among Defendants as to whether the new definition modifies or codifies the common law—the law is unconstitutionally vague and overbroad. Under the stringent constitutional-avoidance standard this Court uses when interpreting state statutes, moreover, Defendants have failed to offer a "reasonable and readily apparent" construction to save the statute. And because First Amendment harms are irreparable *per se*, the preliminary injunction—which merely leaves the common-law definition in place pending trial—should be affirmed.

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

#### A.    HB1's Passage

Florida enacted HB1 in direct response to a wave of nationwide protests for racial justice and police reform. *See* Doc:137 at 3. These protests during the summer of 2020—estimated to be among the largest mass movements in the country's history—stemmed from multiple police

killings of Black people in the context of historical police violence against Black communities in America. Doc:1 at 19-20. In Florida, Black-led organizations, including Plaintiffs, organized most of these protests. Doc:1 at 20-21.

In response, Governor DeSantis and the Florida Legislature enacted HB1. Doc:1 at 23-24; Doc:90 at 58, 63. DeSantis proposed the legislation that led to HB1 in September 2020, Doc:65 at 3-4, promising to have "a ton of bricks rain down on" those who violate the new law, Doc:1 at 25-26. The following day, DeSantis promoted the proposal (then-called the "Combatting Violence, Disorder, and Looting, and Law Enforcement Protection Act") on the Tucker Carlson Show, where he referred to his proposal's (presumed) opposition as "people on the far left" who are "anti-police." Doc:1 at 24-26.[2]

---

[2] In reality, opposition to HB1 crossed ideological lines. After receiving nearly 13,000 opposition emails, Rep. Learned stated that "this might be the first bill in the history of the Florida House that has united abortion protestors with Planned Parenthood *** all in opposition." *Hearing on: HB1 Combating Public Disorder Before the H. Judiciary Comm.*, 2021 Leg. Sess. 2:06:50-2:07:22 (Fl. 2021) (statement of Rep. Learned, H. Judiciary Comm.), https://thefloridachannel.org/videos/3-10-21-house-judiciary-committee/.

HB1 was introduced in the Florida Legislature in January 2021. At the hearings, community organizations and members of the public testified to concerns that the vague new "riot" definition would capture innocent bystanders. Doc:1 at 37-40. Among many examples, one witness feared that she could "potentially be part of a riot" "simply by virtue of being at a peaceful protest, and three people come up with the intent to disrupt and cause a ruckus, and we are all charged with being part of a mob and creating a riot." *Hearing on: HB1 Combating Public Disorder Before H. Crim. Just. & Pub. Safety Subcomm.*, 2021 Leg. Sess. 1:39:56-1:41:15 (Fl. 2021) (statement of Karen Woodall, Exec. Dir. & Co-Founder of Fl. Ctr. for Fiscal & Econ. Pol'y).[3]

Several legislators echoed these concerns. Rep. Andrew Learned noted that Section 15 would "expand[] the definition of a rioter to everyone in the crowd, regardless of their own individual behavior"—and that "judges, state's attorneys, and police on the street will have different interpretations of" Section 15's scope. *H. Judiciary Comm.*, *supra* at 2:07:53–2:08:30. Another representative feared Section 15's "language

---

[3]      https://thefloridachannel.org/videos/1-27-21-house-criminal-justice-public-safety-subcommittee/.

could be used, and interpreted, and applied in a way to subject peaceful protestors to punishment for crimes that they simply happened to be present for." *Hearing on: HB1 Combating Public Disorder Before the S. Comm. on Appropriations*, 2021 Leg. Sess. 1:45:09-1:45:26 (Fl. 2021) (statement of Rep. Gary Farmer, S. Comm. On Appropriations).[4]

Despite these concerns, the Legislature passed HB1 on April 15, 2021, and DeSantis signed it four days later.  Doc:1 at 45.  He called HB1 "the strongest anti-rioting, pro-law-enforcement piece of legislation in the country."  Doc:137 at 73.

Shortly after HB1's passage, Broward County Colonel David Holmes directed district captains not to enforce HB1 because the Sheriff's Office did not need "any overzealous deputies utilizing the new law to conduct enforcement that could violate people's civil liberties."  Doc:1 at 26-27.

---

[4] https://thefloridachannel.org/videos/4-9-21-senate-committee-on-appropriations-part-1/.

### B.    HB1's Provisions

HB1 contains a slate of provisions that individually and collectively suppress expression and promote what DeSantis described as a "pro-law-enforcement" viewpoint.  Doc:137 at 73.

As most relevant here, Section 15 increased law enforcement discretion and power to respond to public disturbances by amending the definition of "riot."  Doc:65 at 8.  Before Section 15, the undefined term "riot" was given its common-law meaning, *i.e.*, a "tumultuous disturbance of the peace by three or more persons, assembled and acting with a common intent" to commit violence.  *State v. Beasley*, 317 So. 2d 750, 752 (Fla. 1975).

The new law effectively amends the common-law definition by prepending seventeen words (underlined below) to the old definition:

> <u>A person commits a riot if he or she willfully participates in a violent public disturbance involving</u> an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct, resulting in:
>
> (a) Injury to another person;
> (b) Damage to property; or
> (c) Imminent danger of injury to another person or damage to property.

FLA STAT. § 870.01(2).  Florida made violations third-degree felonies, which are ordinarily punishable by up to five years in prison.  *Id.* § 775.082(3)(e).

Section 15 also provides that those arrested for rioting "shall be held in custody until brought before the court for admittance to bail." FLA. STAT. § 870.01(6).  This is a stark departure from all other third-degree felonies in Florida, which allow an individual to post bond when charged.  Doc:65 at 8-9.[5]

### C.    Plaintiffs And Their Members

Plaintiffs are civil rights organizations that regularly organize, and whose members regularly attend, demonstrations for racial justice and police accountability.  Doc:137 at 7-19.  In response to HB1, however, Plaintiffs were forced to shift activities away from their core missions and divert resources to different events.  Doc:137 at 8.  "Plaintiffs' and their

---

[5] Other HB1 provisions similarly reveal its "pro-law-enforcement" viewpoint.  For example, one section provides a mechanism by which certain individuals may appeal funding reductions—but not increases— of law-enforcement budgets.  FLA. STAT. § 166.241(4)(a).  Another creates an affirmative duty for municipalities "to protect persons and property during a riot or an unlawful assembly" and imposes civil liability on those that fail "to respond appropriately."  FLA. STAT. § 768.28(5)(b).

members' First Amendment rights are chilled by" HB1's enactment, as

the district court recognized:

> Plaintiffs' evidence establishes, beyond mere conclusions, that
> their members have engaged in self-censoring for fear of the
> challenged statute's enforcement against them. *** The chill
> is evidenced by the unwillingness of their members to turn
> out at protest events in the weeks following HB1's enactment,
> the fact that some of the Plaintiffs have chosen to modify their
> activities to mitigate any threat of arrest at events, and the
> fact that at least one Plaintiff has ceased protest activities
> altogether.

Doc:137 at 8.

Before HB1, Plaintiffs regularly held demonstrations and other

events in furtherance of their missions. Dream Defenders "regularly

organized and participated in political actions and demonstrations

focused on bringing attention to structural inequality" and "led

demonstrations to protest police violence." Doc:65-1 at 2. The Black

Collective, which focuses "on promoting political participation and

economic empowerment of Black communities," organized canvassing

programs and trainings. Doc:65-2 at 1. Chainless Change "works to

dismantle the school to prison pipeline, mass incarceration and all

barriers to socio-economic equality" and has led four protests since May

2020. Doc:65-3 at 1-2. Black Lives Matter Alliance ("BLMA") Broward

11

has, since May 31, 2020, co-organized approximately 30 protests for police reform and accountability. Doc:65-4 at 2-3. The Florida NAACP, a statewide branch of the national NAACP, regularly demonstrates against racial discrimination and racial injustice. Doc:65-6 at 2. And Northside Coalition of Jacksonville, formed to speak out against all forms of racial, social, and economic injustice, held 25-30 rallies, press conferences, and marches following George Floyd's murder—some with thousands in attendance. Doc:65-7 at 3-4.

In response to HB1, Plaintiffs have either stopped holding protests altogether or seen major drops in attendance. Dream Defenders did not schedule any protests after HB1's enactment (aside from one vigil for George Floyd following the Derek Chauvin verdict). Doc:65-1 at 6. Both BLMA Broward and Chainless Change have stopped engaging in rapid direct actions. Doc:65-3 at 4; Doc:65-4 at 6. And even when events are held, many fewer people attend due to fear of arrest under Section 15. *See* Doc:65-5 at 2-3, Doc:65-6 at 4-5 (Florida NAACP); Doc:65-2 at 5-6 (The Black Collective), Doc:65-4 at 6 (BLMA Broward), Doc:65-7 at 5 (Northside Coalition).

12

Plaintiffs have also been forced to direct resources away from their core missions because of HB1. They have held training events to educate members on the new risks of protesting after HB1, Doc:65-1 at 9-10 (Dream Defenders); hired paid canvassers to engage members of the public and discuss HB1's impact, Doc:65-2 at 5 (The Black Collective); and spent weekly meetings strategizing about member safety during protests and how to "train community members to use their voices in ways other than through protesting," Doc:65-4 at 6-7 (BLMA Broward).

Plaintiffs' fears that "police and agitators will be emboldened by HB1 and specifically Section 15," Doc:65-1 at 7, are grounded in the statutory text of HB1 and in their past experiences with counter-protestor violence. For example, at a protest co-organized by BLMA Broward in May 2020, agitators joined the crowd and appeared to try to incite a police reaction. Doc:65-4 at 3. Police ultimately used tear gas and physical violence on protestors. Doc:65-4 at 3. If HB1 had existed then, members fear they would have been arrested even though they were non-violent and unaffiliated with the agitators. Doc:65-4 at 4. Northside Coalition has had similar experiences: In late May 2020, after its event ended, non-member participants continued their own protest,

and Defendant Williams deployed a SWAT team based on minor graffiti and a possible broken window.  Doc:65-7 at 4.  Over 70 people were arrested.  *Id.*; *see* Doc:65-1 at 7-9 (Dream Defenders members describing "agitators [who] enter political demonstrations and engage against police in order to draw police into the crowds" and "violence against protestors by white supremacist and other counter-protestors"); *see also* Doc:137 at 77 (describing Plaintiffs' evidence).

## II.    PROCEDURAL HISTORY

On May 11, 2021, just three weeks after HB1's enactment, Plaintiffs filed a complaint against DeSantis, Williams, Sheriff Walt McNeil of Leon County, Sheriff Gregory Tony of Broward County, and Attorney General Ashley Moody.  Doc:1.  Each Defendant moved to dismiss, arguing they were improperly named and Plaintiffs failed to state a claim.  Doc:90 at 8-9.

On August 9, 2021, the district court issued a 72-page order dismissing Moody from the suit and some of the claims against DeSantis and Defendant Sheriffs.  Doc:90 at 72.  As relevant here, the court denied the motion to dismiss the claim challenging Section 15 because Plaintiffs

had standing "to seek an injunction against" both Defendants and neither was immune.  Doc:90 at 42, 55-71.

While Defendants' motions to dismiss were pending, Plaintiffs sought a preliminary injunction to enjoin Defendants from enforcing Section 870.01(2)'s new "riot" definition.  Doc:64 at 1-5.  Although Williams consistently maintained that the definition codified the common law, at the hearing on the motion, DeSantis changed his position from briefing to acknowledge that Section 15 "clarifies," not merely codifies, the common law.  Doc:132 at 83-84; *see* Doc.137 at 61 (calling argument "a moving target").

On September 9, 2021, the district court entered a 90-page order granting the preliminary injunction.  Doc:137.  Starting with standing, the district court found both organizational and associational injuries-in-fact based on Plaintiffs' declarations, which showed "well-founded fears" leading to self-censorship and diversion of resources.  Doc:137 at 6-20.  In "credit[ing]" Plaintiffs' evidence, the court noted that it was "largely unchallenged," and that the evidence submitted by the Governor failed

to undermine Plaintiffs' injuries.  Doc:137 at 20-27.[6]  The court explained that the chilling of Plaintiffs' exercise of First Amendment rights constitutes not just injury-in-fact but irreparable harm.  Doc:137 at 79. The court also rejected various other threshold challenges.

Turning to the merits, the court held that Plaintiffs showed a likelihood of success on their claim that HB1's definition of "riot," properly construed, is both impermissibly vague and overbroad.  Doc:137 at 44.  The court analyzed the statutory language for over 20 pages. Doc:137 at 45-67.  It ultimately concluded that the "riot" definition fails to clarify the meaning of the key terms "participates" and "violent public disturbance," and fails to clarify whether the "person" must share the "common intent" of the rioters.  Doc:137 at 48-57.  Applying the tools of statutory construction, the court reasoned that an individual of ordinary

_____

[6] In contrast to Plaintiffs' detailed declarations, DeSantis introduced limited evidence that the district court found immaterial or unhelpful—either because it did "not contradict Plaintiffs' declarations or their asserted injuries," "ha[d] nothing to do with a purported protest" (but rather a community celebration in support of a federal holiday), or "d[id] not pertain to these Plaintiffs."  Doc:137 at 22-27.  Moreover, neither Defendant "sought limited discovery" or "ask[ed] to present live testimony at the hearing"—which the district court "would have absolutely permitted."  Doc:137 at 22 n.9.

intelligence would not know if the law "meant that she had to merely avoid sharing a common intent to assist two others in violent and disorderly conduct, or if she had to avoid participating in any public event where such violent and disorderly conduct could occur."  Doc:137 at 70-74.  And because the former (constitutional) reading was neither "reasonable" nor "readily apparent" from the statutory text, adopting Defendants' construction would require the court to usurp the power of the Florida Legislature.  Doc:137 at 67.

As to overbreadth, the court concluded that, while the statute applied to much unprotected activity, it also criminalized "vast swaths of core First Amendment speech"—including mere presence at a protest after violence occurs.  Doc:137 at 75-76.

Finally, the court found that the remaining preliminary injunction factors weighed strongly in favor of granting the injunction.  Doc:137 at 78.  Because Plaintiffs "demonstrated that their speech has been, and is being, chilled," they showed irreparable harm, and the roughly three months between HB1's passage and Plaintiffs' preliminary-injunction filing was reasonable.  Doc:137 at 79-82.  As to the public interest, the court rejected DeSantis's arguments that the injunction would "severely

17

curtail the State's ability to deter and prosecute violent demonstrations to protect public safety and private property." Doc:137 at 82-84. In doing so, the court listed numerous other statutes—including the predecessor riot statute—authorizing Defendants to protect public safety. Doc:137 at 82-84.

The district court accordingly ordered DeSantis and Sheriffs Williams, McNeil, and Tony to "take no steps to enforce" the new riot definition "until otherwise ordered." Doc:137 at 89-90. DeSantis and Williams appealed the preliminary injunction, but McNeil and Tony did not.

## STANDARD OF REVIEW

"A district court's grant of a preliminary injunction order involves a mixed standard of review." *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1198 (11th Cir. 1999). The "decision to grant the injunction is reviewed for abuse of discretion," while "[q]uestions of law supporting the injunction are reviewed de novo" and "[f]indings of fact are reviewed for clear error." *Id.* This Court's review is "justifiably limited" because "the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities

of ultimate success *** with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief." *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1517 (11th Cir. 1994) (ellipsis in original).

## SUMMARY OF THE ARGUMENT

The preliminary injunction order should be affirmed.

**I.** Plaintiffs have standing, both as organizations and on behalf of their members. Plaintiffs' detailed declarations—credited by the district court and unchallenged on appeal—demonstrate that their well-founded fears have led to significant self-censorship by their members and diversion of their organizational resources. In addition, Florida enacted a law, which Defendants can enforce, that at least arguably criminalizes First-Amendment-protected activities in which Plaintiffs and their members would otherwise engage. No greater showing is required.

**II.** The district court did not abuse its discretion in concluding that Plaintiffs satisfied the preliminary injunction factors warranting relief.

Plaintiffs showed a substantial likelihood of success on their vagueness claim. In construing a state statute, a federal court may adopt a proffered "saving" construction only if it is "reasonable and readily

19

apparent." But a grammatically proper reading of the riot definition—consistent with HB1's purpose and history—expands the common law to encompass not just those who share a common intent to commit violence, but anyone who "willfully participates" in a disturbance "involving" such a common-law riotous assembly. It thus makes hopelessly unclear whether the statute criminalizes continuing to protest peacefully while others commit violence—which is more than a theoretical concern given that agitators have violently disrupted Plaintiffs' peaceful protests in the past. The legislation therefore fails to give potential protestors the ability to conform their conduct to the law, and invites arbitrary and discriminatory enforcement by law enforcement. Indeed, given the disagreement among Defendants themselves on the statute's meaning, ordinary people cannot be expected to understand it.

Plaintiffs also demonstrated a likelihood of success on overbreadth. Section 15 "expands the definition of a rioter to everyone in the crowd, regardless of their own individual behavior." *H. Judiciary Comm.*, *supra* at 2:07:53-2:08:03. By criminalizing purposeful attendance at a protest where fringe violence occurs, the statute permits guilt by association and sweeps in vast swaths of protected First Amendment activity.

20

The remaining factors strongly favor Plaintiffs as well.  The loss of Plaintiffs' First Amendment freedoms establishes *per se* irreparable harm.  In contrast, Defendants can point to no harm whatsoever, particularly given their (specious) argument that Section 15 merely codified (or clarified) the common-law definition of "riot," as that definition will remain in place during the injunction.  In addition, the public has a compelling interest in protecting the constitutional rights to speak, assemble, and petition the government.  Finally, the court did not abuse its discretion in granting the injunction.

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING

Standing requires that Plaintiffs demonstrate an "injury in fact," fairly traceable to Defendants' challenged action, that is "likely" to be "redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).  For purposes of injunctive relief, Plaintiffs need demonstrate only a "reasonable probability of ultimate success upon the question of jurisdiction."  *Unique Fin. Concepts, Inc.*, 196 F.3d at 1198.

### A.    Plaintiffs Have Suffered Two Types Of Injury-In-Fact

*1.    Plaintiffs Have Standing To Sue Both In Their Own Right And On Behalf Of Their Members*

The district court held, based on detailed factual findings, that Plaintiffs established injury-in-fact by virtue of their evidence that (1) "Plaintiffs, as organizations, have \*\*\* shifted their activities away from their core mission and diverted resources to different events and operations in response to the statute's amendment," and (2) Plaintiffs' "members have engaged in self-censoring for fear of the challenged statute's enforcement against them." Doc:137 at 7-8. Either finding with respect to even one Plaintiff is sufficient to establish a constitutional injury. *See Georgia Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1258 (11th Cir. 2012). There was no error, let alone "clear error," in the "factfindings underlying [the] standing determination." *A.C.L.U. of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009).

*Organizational standing.* "[A]n organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir.

22

2014).  The district court found that Plaintiffs met this standard because they were forced to divert significant resources to responding to HB1, including educating community members on the law's implications and rethinking organizational advocacy strategies in light of Section 15. Doc:137 at 8.  Dream Defenders, for example, organized "events around the state focused on educating members and communities on the risks associated with political protests and public gatherings" under HB1; The Black Collective hired three paid canvassers to go door to door to discuss the law's implications; and BLMA Broward devoted weekly organizational meetings to HB1 and keeping its members safe during any future marches.  Doc:137 at 11.  These uncontested factual findings are alone sufficient to establish injury in fact.

*Associational standing.*  An organization separately may have standing "on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Greater Birmingham Ministries v. Secretary of State of Ala.*, 992 F.3d 1299, 1316

(11th Cir. 2021). The organization need show only that one of its members has been injured to support standing. *Arcia*, 772 F.3d at 1342. Defendants challenge only the first prong—whether Plaintiffs' members suffered injury (and thus would have standing in their own right).

Since the day HB1 was enacted, Plaintiffs' members have engaged in self-censorship—a form of irreparable harm long recognized in the First Amendment context, *see A.C.L.U. v. Florida Bar*, 999 F.2d 1486, 1492 (11th Cir. 1993)—to avoid criminal consequences under the new law. Self-censorship is a cognizable harm when a person reasonably believes they must "forego what [they] considered to be constitutionally protected speech in order to avoid" enforcement. *See id.* at 1492; *see also Harrell v. Florida Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010) (finding injury where "at least arguable that [challenged] rules' alleged vagueness exerts a chilling effect on Harrell's proposed *** speech"). Plaintiffs can thus establish injury by showing that (1) they intend to engage in a course of conduct "arguably affected [by] a constitutional interest," (2) the challenged law arguably affects that course of conduct, and (3) there "exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *see Wollschlaeger v. Governor,*

24

*Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc). These injury requirements are "most loosely applied *** where first amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991).

In a dozen pages of factual findings, the district court credited Plaintiffs' evidence as "establish[ing], beyond mere conclusions, that their members have engaged in self-censoring for fear of the challenged statute's enforcement against them." Doc:137 at 8-20. The evidence overwhelmingly showed that Plaintiffs' members would have engaged in, but refrained from, expressive activity indisputably protected by the First Amendment. *See*, *e.g.*, Doc:137 at 20 (crediting "the declarants' statements regarding their organizations' missions, core activities, and their members' fears of protesting now that HB1 has become law"). Although Plaintiffs and their members have historically engaged in public demonstrations to advocate for reform geared toward bringing about a more just society, HB1 prompted many members to refrain from public demonstration due to "well-founded fears" (Doc:137 at 31-32) that

the new law criminalizes mere presence at a demonstration that turns violent. *See, e.g.,* Doc:65-1 at 9-10; Doc:65-2 at 4-7; Doc:65-3 at 4-5; Doc:65-4 at 4-5, 8; Doc:65-5 at 2-3; Doc:65-6 at 4.

Plaintiffs also meet the "quite forgiving" standard of demonstrating a credible threat of prosecution. *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998); *see* Doc:137 at 20, 37; Doc:90 at 22-25. "[W]hen dealing with pre-enforcement challenges to recently enacted *** statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *New Hampshire Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996); *see also International Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 822-823 (5th Cir. 1979) ("The very existence of this censorial power, regardless of how or whether it is exercised, is unacceptable.").[7] An intent to enforce the challenged law can be inferred where it is challenged soon after enactment or where the enforcing authority

---

[7] This Court has adopted as binding precedent all decisions of the former U.S. Court of Appeals for the Fifth Circuit before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

vigorously defends it in court. *See Wollschlaeger*, 848 F.3d at 1305; *Harrell*, 608 F.3d at 1257. Both circumstances are present here.

### 2. *Defendants' Contrary Arguments Are Unavailing*

Defendants do not challenge the district court's factfinding on appeal, but contend that Plaintiffs' injuries cannot be established as a matter of law. Defendants are mistaken.

DeSantis primarily argues that Plaintiffs' self-censorship or diversion of funds arises from an unreasonable interpretation of Section 15. *See* DeSantis Br. 12-13. But whether Section 15 restricts constitutionally protected expression, including expression in which Plaintiffs' members wish to engage, is the heart of the parties' disagreement—and is therefore more appropriately a merits question. *See Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018) (warning against conflating merits with standing). The question for standing at this stage is only whether the conduct in which members would otherwise engage is "arguably proscribed" by Section 15. *Driehaus*, 573 U.S. at 163; *see Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 392 (1988) (finding standing where, "if [plaintiffs'] interpretation of the statute [wa]s correct," plaintiffs would be required to undertake significant costly

measures or risk prosecution); *Harrell*, 608 F.3d at 1260 (asking whether statute "at least arguably" forbids the activity); *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 332 n.10 (5th Cir. 2020) (rejecting defendant's argument that plaintiff's interpretation was mistaken because "the question is simply whether speech is 'arguably *** proscribed by' the challenged policies.") (ellipsis in original).   Here, given that it was adopted by the district court, Doc:137 at 45-78, there can be no reasonable dispute that Plaintiffs' interpretation of Section 15 is "at least arguably" correct.

It is true that Defendants take the position (for purposes of this litigation) that Plaintiffs' members do not risk arrest for engaging in constitutionally protected activity.   But that does not diminish their standing.   *See A.C.L.U.*, 999 F.2d at 1494 (court statements that are not binding on enforcing authority or on final arbiter of challenged law's meaning do not defeat prospect of future harmful enforcement); *West Ala. Women's Ctr. v. Williamson*, 900 W.3d 1310, 1328 (11th Cir. 2018) ("Mid-litigation assurances are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them.").   In *Wollschlaeger*, a policy letter from the enforcing authority

clarifying that the law did not prohibit the conduct in which the plaintiffs wished to engage did not undermine the credible threat of prosecution because it was nonbinding.  848 F.3d at 1306.  The same rationale applies to the nonbinding statutory interpretations set forth only in Defendants' briefs.[8]

Defendants also rely heavily on *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), to argue Plaintiffs lack standing because their harm is insufficiently "imminent."  *See* DeSantis Br. 13-17.  In *Clapper*, the plaintiffs claimed a government-surveillance statute was reasonably likely to be used to capture the communications of plaintiffs' third-party associates, and thus to incidentally capture plaintiffs' communications. *Clapper*, 568 U.S. at 401.  The plaintiffs did not allege that they self-censored in response to the prospect of enforcement of a punitive statute against them, but instead out of fear that it would be enforced against "*other individuals*."  *Id*. at 411.  The Court therefore did not apply the legal framework, *see supra* section A.1, that has been applied both before

---

[8] If Defendants are willing to stipulate in a binding manner to their statutory interpretation, then Plaintiffs are willing to discuss withdrawing their preliminary injunction motion and settling this appeal.

29

and after *Clapper* to the circumstance where, as here, the plaintiff is the subject of regulation. *See Driehaus*, 573 U.S. at 158-161 (applying and discussing the relevant framework). Unlike in *Clapper*, under the interpretation of HB1 the district court adopted, Plaintiffs are self-censoring because they are directly subject to criminal liability— including a mandatory period in jail—simply for exercising First Amendment rights.[9]

### B.    Plaintiffs Have Established Causation And Redress

The second and third prongs of standing—causation and redress— are "intertwined." *Reproductive Health Servs. v. Strange*, 3 F.4th 1240, 1252 (11th Cir. 2021). Generally, in a pre-enforcement challenge, this Court asks whether the defendant "official has the authority to enforce the particular provision[s] *** challenged, such that an injunction prohibiting enforcement would be effectual." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). The district court correctly held that DeSantis and Williams each have authority to

---

[9] *Clapper* is further distinguishable because of the Court's reluctance to find standing due to separation-of-powers concerns in cases challenging "actions of the political branches in the fields of intelligence gathering and foreign affairs." 568 U.S. at 408-409.

enforce Section 15 and that an injunction prohibiting them from doing so would redress Plaintiffs' harm.

*Governor DeSantis.*   As the district court found, "Florida law specifically gives Governor DeSantis the power to order sheriffs to suppress riots and unlawful assemblies and to take direct command of the Florida Highway Patrol to do the same."  Doc:137 at 28.  Specifically, DeSantis has the constitutional "power to call out the militia to preserve the public peace, execute the laws of the state, suppress insurrection, or repel invasion."   FLA. CONST. art. IV § 1(d).   He also has statutory authority to mobilize the militia, including the National Guard, in response to "a riot" and "unlawful assembly," both implicated by HB1. *See* FLA. STAT. §§ 250.06, 250.28, 870.01.  Whenever, in "his opinion," an "unlawful assemblage" has threatened "the person or property of any citizen *** of the state," DeSantis may (1) "[c]all out the military forces of the state"; (2) "[o]rder any sheriff *** to exercise fully the powers granted them" to suppress tumults, riots, and unlawful assemblies; and (3) "direct the State Highway Patrol *** to do and perform such acts and services as the Governor may direct."  *Id.* § 14.022(2), (3)(a)-(c).  He may remove any sheriff who disobeys his directive, pending a Senate hearing.

FLA. CONST. art. IV § 7(a). And he has broad authority over assigning states attorneys to "specified investigations, cases, or matters." FLA. STAT. § 27.14(1); *see also Ayala v. Scott*, 224 So. 3d 755, 757-758 (Fla. 2017).

During the racial justice protests of 2020, DeSantis exercised his constitutional and statutory authority to mobilize 700 National Guard troops and 1,300 Florida Highway Patrol officers to respond to protests— protests he acknowledged were "largely peaceful." Doc:137 at 3 n.5 (citing News Release, Office of Gov. Ron DeSantis, *Gov. Ron DeSantis Reports That Florida Demonstrations Have Remained Largely Peaceful Over Past 24 Hours* (June 2, 2020)[10]). DeSantis has also exercised his removal power against county sheriffs. *See Israel v. DeSantis*, No. 4:19-cv-576, 2020 WL 2129450, at *1 (N.D. Fla. May 5, 2020).

DeSantis nevertheless argues that Plaintiffs cannot adequately tie their harms to him, crafting a chain of events he claims are unlikely to occur. DeSantis Br. 16-17. In doing so, he misunderstands the nature of

---

[10] https://www.flgov.com/2020/06/02/governor-ron-desantis-reports-that-florida-demonstrations-have-remained-largely-peaceful-over-past-24-hours.

a pre-enforcement challenge, under which a plaintiff must show only that the defendant has enforcement "authority"—not that the defendant will definitely exercise that authority. *Support Working Animals*, 8 F.4th at 1201; *see also Clapper*, 568 U.S. at 414 n.5 ("Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about."); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing[.]").  Here, the Governor has the power to mobilize the National Guard, Florida Highway Patrol, and militia to enforce Section 15, in addition to the authority to order sheriffs to enforce the challenged section.  His recent exercise of similar enforcement authority, coupled with his threat "to have 'a ton of bricks rain down on' those who violate the law," Doc. 137 at 73, establishes a "substantial risk" that DeSantis will invoke his Section 15 authority in the manner Plaintiffs fear.  *Clapper*, 568 U.S. at 414 n.5.

DeSantis's arguments as to redressability fare no better.  First, he argues that enjoining the enforcement of Section 15 would not redress Plaintiffs' harms because of Plaintiffs' allegation that police had tools at their disposal to address unlawful violence prior to the enactment of HB1.

33

DeSantis Br. 15. That makes no sense. Plaintiffs argue HB1 was unnecessary to deter *unlawful* conduct and that the new riot definition chills and burdens *lawful* activity. Enjoining a law that criminalizes constitutionally protected conduct would inarguably redress Plaintiffs' self-censorship undertaken in response to that law.

DeSantis next argues (Br. 15) that because police abuses occurred under the law as it existed before the enactment of Section 15, an injunction would not redress Plaintiffs' injuries—despite their credible fear that the new law will *exacerbate* discriminatory policing. *See, e.g.*, Doc:65-2 at 7 (describing "threat of police abuse" as "heightened"); Doc:65-3 at 5 (HB1 gives officers "even more discretion to target non-violent protesters"); Doc:65-6 at 3-4 (noting "history of disproportionate arrests" exacerbated concerns of targeting Black Floridians). Just as "Article III *** does not demand that the redress sought by a plaintiff be complete," *Moody*, 887 F.3d at 1287, DeSantis cannot demand that

Plaintiffs' lawsuit cure every ailment in the enforcement of Florida's criminal laws.[11]

*Sheriff Williams.*    Williams likewise has authority to enforce Section 15 as the conservator of peace in Jacksonville. *See Sweat v. Waldon*, 167 So. 363, 364 (Fla. 1936). He is mandated by state law to conserve the peace and "[s]uppress tumults, riots, and unlawful assemblies *** with force and strong hand when necessary." FLA. STAT. § 30.15(e)-(g). He does not challenge that authority or the district court's related findings. Doc:137 at 29-31.

In passing, however, Williams argues that Plaintiffs suffered no irreparable injury traceable to him because he did not draft, pass, or sign HB1 and has not yet enforced Section 15. Williams Br. 31. But as noted, in the pre-enforcement context, it is the authority "designated to enforce th[e challenged] rule who is the proper defendant, even when that party

---

[11] DeSantis argues in a footnote that sovereign immunity precludes the entry of an injunction against him. DeSantis Br. 17 n.8. Because this argument is raised only in a footnote, it is waived. *See Brown v. United States*, 720 F.3d 1316, 1332-1333 (11th Cir. 2013). In any event, DeSantis's unconstitutional conduct can be enjoined pursuant to *Ex parte Young* because he has at least "some connection" to the enforcement of the challenged law, 209 U.S. 123, 157 (1908). Doc:137 at 29 n.12.

35

has made no attempt to enforce the rule." *A.C.L.U.*, 999 F.2d at 1490.

Williams undisputedly has the authority to enforce Section 15.[12]

\*\*\*

Despite Defendants' attempts to obfuscate the inquiry, standing is straightforward here: the State of Florida enacted a law, which the Sheriff and Governor can enforce, that at least arguably prohibits constitutionally protected activity in which Plaintiffs' members would otherwise engage and that has forced Plaintiffs to divert resources from their core missions. No more is required.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN GRANTING THE PRELIMINARY INJUNCTION

A district court has discretion to grant a preliminary injunction where a plaintiff shows (1) "a substantial likelihood of success on the merits," (2) "irreparable injury" absent an injunction, (3) "the threatened

---

[12] The district court properly held that, for purposes of enforcing Section 15, the Sheriff acts as an arm of the state and thus can be sued under *Ex parte Young*. Doc:90 at 43-55; Doc:137 at 32 n.14. Williams himself stated that "when county officials are sued for their role in enforcing a state law, the county officials are acting as an arm of the state." Doc:90 at 53. In any event, his failure to argue otherwise on appeal waives any such objection. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680-681 (11th Cir. 2014) ("A party fails to adequately brief a claim when he does not plainly and prominently raise it.").

injury to the movant outweighs" harm to the enjoined party, and (4) "the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Courts may employ a "sliding scale" where they "balanc[e] the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Florida Med. Ass'n v. United States Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). The district court did not abuse its discretion by granting the preliminary injunction after finding Plaintiffs satisfied all four factors. Doc:137 at 78.

## A.    Plaintiffs Are Likely To Succeed On The Merits

The First Amendment provides that a state may "make no law *** abridging the freedom of speech *** or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I; *see Near v. State of Minn. ex rel. Olson*, 283 U.S. 697, 707 (1931) (incorporating First Amendment against the states). "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462-463 (1987).

Because Section 15 threatens Plaintiffs' members with arrest *and* requires mandatory custody until first appearance, Fla. Stat. § 870.01(6), this case "provides a textbook example of why we permit facial challenges to statutes that burden expression." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002); *see also Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011) (pre-enforcement challenge proper where "litigant is chilled from engaging in constitutionally protected activity"). An as-applied challenge would obligate Plaintiffs to assume the risk of beginning their fight for their First Amendment rights from a jail cell, and those found in violation face prison time and a felony conviction, Fla. Stat. §§ 870.01(2), 775.082(3)(e), 775.084(4). "With these severe penalties in force, few *** would risk" protesting "in or near the uncertain reach of this law." *Ashcroft*, 535 U.S. at 244.

1. *The Statute Is Vague*

a. <u>Legal Standard</u>

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). A law is unconstitutionally vague and violates the Due Process Clause if it "subjects the exercise of the right of assembly to an unascertainable standard," such that persons

"of common intelligence must necessarily guess at its meaning" and differ as to its application. *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). "[W]here a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms.'" *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) and *Cramp v. Board of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961)). Thus, "standards of permissible statutory vagueness are strict in the area of free expression." *N.A.A.C.P. v. Button*, 371 U.S. 415, 432 (1963).

Importantly, in construing a state statute's constitutionality, federal courts may not adopt just any "plausible" or "fairly possible" construction to save it from impermissible vagueness. Instead, the district court held—and all parties appear to agree—that only a "reasonable and readily apparent" narrowing construction will do. Doc:137 at 46-47; DeSantis Br. 9, 21, 26, 27, 34; Williams Br. i, 5, 8, 20, 21, 22, 24, 29; *see Boos v. Barr*, 485 U.S. 312, 330 (1988) (comparing state and federal standards). Courts employ that stringent standard, rather than the traditional constitutional-avoidance standard for interpreting federal laws, because "it is not within [the] power [of the federal courts]

39

to construe and narrow state laws." *Grayned*, 408 U.S. at 110; *see Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) ("[A]dopting the Attorney General's interpretation might avoid the constitutional problem discussed[,] *** [b]ut we are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent.") (internal quotation marks omitted); *accord Boos*, 485 U.S. at 330. Accordingly, on many occasions, this Court has refused to construe state statutes to avoid infringing First Amendment rights where doing so would be "inconsistent with the plain meaning of the words of the statute." *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997); *see, e.g.*, *Florida Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1329 (11th Cir. 2001) (rejecting narrowing construction because "[t]o do otherwise would require us to ignore our commitment, as a federal court, to be vigilant against rewriting the terms of state statutes"); *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1572 (11th Cir. 1993) ("[A]s a federal court, we must be particularly reluctant to rewrite the terms of a *state* statute.").

In sum, the "question before this Court is not whether there is *any* reading that would render the statute constitutional" or "whether there

40

is a possible, plausible, or simply reasonable reading," but rather whether there "is a constitutional reading of the statute that is both *reasonable* and *readily apparent* and, thus, does not require this Court to rewrite the statute to conform it to constitutional requirements." Doc:137 at 48.[13]

> b. <u>Section 15 Fails To Define What Conduct It Prohibits And Encourages Arbitrary Enforcement</u>

"A law 'can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement.'" *Wollschlaeger*, 848 F.3d at 1319 (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Florida's new "riot" definition does both.

---

[13] To the extent Williams at times appears to contest that standard, *see* Williams Br. 21-22 (citing *Clark v. Martinez*, 543 U.S. 371 (2005) and *Pine v. City of West Palm Beach*, 762 F.3d 1262 (11th Cir. 2014)), he is mistaken. *Clark* involved construction of a *federal* statute. 543 U.S. at 385. And *Pine* is distinguishable because the statute at issue *was* susceptible to a reasonable and readily apparent constitutional construction; this Court did not "overrule itself and the Supreme Court *sub silentio*." Doc:137 at 48 n.19. Here, Plaintiffs certainly do not concede that "it would be reasonable to read the statute as Sheriff Williams does." Williams Br. 14.

As codified, Section 15 provides in relevant part that:

A person commits a riot if he or she willfully participates in a violent public disturbance involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct, resulting in:

(a) Injury to another person;
(b) Damage to property; or
(c) Imminent danger of injury to another person or damage to property.

FLA. STAT. § 870.01(2).

As an initial matter, the statute fails to define what it means to "participate" in a violent public disturbance. Although a participant must act "willfully"—*i.e.*, "intentionally and purposefully," *State v. Dorsett*, 158 So. 3d 557, 562 (Fla. 2015)—the statute fails to distinguish between those who participate in violence and those who "participate" in a larger assembly with violent elements, as the district court recognized:

Is it enough to stand passively near violence? What if you continue protesting when violence erupts? What if that protest merely involves standing with a sign while others fight around you? Does it depend on whether your sign expresses a message that is pro- or anti- law enforcement? What about filming the violence? What if you are in the process of leaving the disturbance and give a rioter a bottle of water to wash tear gas from their eyes?

Doc:137 at 52. Nothing in the statutory language bars the arrest and prosecution of a person who intentionally participates in "a violent public

42

disturbance" through attendance, but who "does not engage in violence or conduct that poses an imminent risk of injury or property damage." Doc:137 at 53; *see id.* (noting that Defendants offered no such construction).

The riot definition also leaves the critical phrase "violent public disturbance" undefined. Doc:137 at 52. It thus fails to answer such basic questions as whether that term encompasses "a peaceful protest that later turns violent," or a protest that, while not yet violent, "creates an imminent risk of violence." Doc:137 at 53; *see* FLA. STAT. § 870.01(2)(c) (criminalizing actions "resulting in[] *** [i]mminent danger" of harm). By using the modifier "involving," the Legislature apparently chose to "situate the riotous assembly of three or more persons within a larger whole—a 'violent public disturbance.'" Doc:137 at 54; *see id.* ("[T]he smaller assembly and the larger public disturbance are two distinct concepts[.]"). But in doing so, the definition does not clarify whether "the violent actions of three people render an otherwise peaceful protest of 300 people a violent public disturbance." Doc:137 at 53; *see id.* at 56 (observing that "a movie involving sex and violence is not necessarily a

film in which all the characters do throughout the film is engage in sex and violence").

The statute further "muddles things" by confusingly "stack[ing] multiple participial phrases on each other," thereby separating the intent to commit violence from the person participating in the public disturbance. Doc:137 at 54. The statute refers to willful participation in a violent public disturbance "*involving* an assembly of three or more persons, *acting* with a common intent to assist each other in violent and disorderly conduct, *resulting* in" injury, property damage, or imminent risk of either. FLA. STAT. § 870.01(2) (emphases added). Under traditional rules of construction, "a limiting clause or phrase *** should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Accordingly, the modifier "acting with a common intent to assist each other in violent and disorderly conduct" is most naturally read to modify the adjacent phrase "three or more persons," as the district court reasoned, rather than the "person" at the beginning of the sentence. Doc:137 at 56-57.

The purpose and history of HB1 support the district court's grammatical reading. *See Autauga Cnty. Emergency Mgmt. Commc'n Dist. v. F.C.C.*, 17 F.4th 88, 99 (11th Cir. 2021) ("history" and "stated purpose" among "traditional tools of statutory construction"). DeSantis acknowledges that HB1 was enacted in direct response to nationwide racial justice protests. *See* DeSantis Br. 3-4. Although Florida had criminalized rioting for over a century—and although Defendants acknowledge making many arrests during the 2020 protests under the existing riot law and other criminal statutes, *see id.*—Florida saw fit not only to increase rioting penalties and mandate time in custody, but also to expand the common law definition to encompass more people and conduct. In other words, in direct response to protests seeking police accountability, the Legislature intentionally created *more* enforcement targets for police and *more* police discretion regarding who to arrest at those protests.[14]

_____

[14] Oklahoma, like Florida, also enacted anti-protest measures on a similar timeline and for similar purposes, and a federal court preliminarily enjoined certain provisions on vagueness and overbreadth grounds. *See Oklahoma State Conf. of the N.A.A.C.P. v. O'Connor*, No. CIV-21-859-C, --- F. Supp. 3d ---, 2021 WL 4992754, at *2 (W.D. Okla.

The statements of some legislators, and DeSantis himself, support that interpretation. During the deliberations leading up to HB1's enactment, bill co-sponsor Rep. Juan Fernandez-Barquin essentially acknowledged Section 15 was intended to broaden liability by arguing that "when an individual is in a group, that individual loses their personal sense of responsibility." *H. Crim. Just. & Pub. Safety Subcomm.*, *supra* at 3:53-4:39; *see id.* at 19:03-20:09 (noting that individuals "in a large group" "need to be responsible for their actions"). Rep. Learned also warned that the new law appears to "expand[] the definition of a rioter to everyone in the crowd, regardless of their own individual behavior." *H. Judiciary Comm.*, *supra* at 2:07:53-2:08:03. The Legislature enacted HB1 anyway.

For his part, DeSantis called HB1 "the strongest anti-rioting, pro-law enforcement piece of legislation in the country," and referred to HB1's critics as "anti-police." Doc:137 at 73. He further "promised to have 'a ton of bricks rain down on'" those who violate the statute. Doc:137 at 73.

---

Oct. 27, 2021), *appeal docketed*, No. 21-6156 (10th Cir. Nov. 29, 2021); *see also Dakota Rural Action v. Noem*, 416 F. Supp. 3d 874, 893 (D.S.D. 2019) (granting motion for preliminary injunction against anti-rioting statute aimed at oil pipeline protests).

As the district court found based on these and other statements, DeSantis "cannot credibly argue" HB1 "was not intended to empower law enforcement officers against those who may criticize their legal authority." Doc:137 at 73.

Sheriff Williams counters that the legislature merely "adopted and codified the common law definition as expressed in *Beasley*." Williams Br. 20. But Defendants cannot get their stories straight. After originally arguing that "the new definition merely mirrors or codifies the common-law definition of riot," "Governor DeSantis then retreated from that position at the [district court] hearing in asserting that, instead of *codifying* the definition, it *clarified* the definition." Doc:137 at 83 n.29; *see* Doc:132 at 83-84 (DeSantis counsel: "[W]e're certainly not saying it is a mirror image."). His dubious new position is that the Legislature actually set out "to protect" peaceful protesters, DeSantis Br. 4, by "ma[king] explicit that prohibited conduct must be intentional," *id.* at 2—even though the common law *already required* intentional conduct. *Beasley*, 317 So. 2d at 752 (rioters must share "common intent" to act "in a violent and turbulent manner"). Regardless, if Defendants cannot even

47

agree among themselves on what Section 15 does, ordinary people cannot be expected to understand it, either.

Defendants' argument also raises an obvious question: because Section 15 already includes the common-law definition of a riotous "assembly of three or more persons," Fla. Stat. § 870.01(2), "one must wonder what the 17 words preceding this portion of the definition are doing," Doc:137 at 63. Defendants' interpretations have an obvious surplusage problem, as the statute would mean precisely the same thing excising the following words: "A person commits a riot if he or she ~~willfully~~ participates in ~~a violent public disturbance involving~~ an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct *** [.]" FLA STAT. § 870.01(2). Courts must give meaning to "every word, phrase, sentence, and part of the statute." *Edwards v. Thomas*, 229 So. 3d 277, 284 (Fla. 2017) (quoting *Quarantello v. Leroy*, 977 So. 2d 648, 651-652 (Fla. Dist. Ct. App. 2008)). And after "[g]iving meaning to *all* the words used by the Legislature," the district court correctly recognized that the "new definition changed the common-law definition by separating 'a person'

from the 'assembly of three or more persons' who share a 'common intent'"—and thus crossed the First Amendment line.  Doc:137 at 63.

In short, Section 15 fails to provide people of ordinary intelligence a reasonable opportunity to understand what will subject them to arrest, thus impermissibly chilling their protected speech—a "particularly pronounced" danger given the "mandatory time in custody until first appearance."  Doc:137 at 40 (citing FLA. STAT. § 870.01(6)); *see Button*, 371 U.S. at 432-433 ("The threat of sanctions may deter [protected expression] almost as potently as the actual application of sanctions."). And by "leav[ing] unclear who must share what intent to be arrested, law enforcement officers, prosecutors, and courts cannot rely, and cannot be held to rely, on objective standards."  Doc:137 at 72; *see Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (laws invite "arbitrary or discriminatory law enforcement" when they fail to "provide standards to govern the actions of police officers, prosecutors, juries, and judges").

c.   <u>Defendants Fail To Offer Any Reasonable And Readily Apparent Constitutional Reading</u>

In the face of the seriously uncertain scope of Section 15, Defendants fail to offer a "reasonable and readily apparent" reading that avoids infringing First Amendment rights.  Defendants argue that

Section 15 must be read to require the person arrested to have engaged in violence or acted with violent intent, but none of their arguments is persuasive.

*First*, Governor DeSantis quotes the dictionary definition of "participate" and argues it has a readily understood meaning.  DeSantis Br. 21-22.  "But even a commonly understood word may be rendered ambiguous by the language surrounding it."  Doc:137 at 52; *see*, *e.g.*, *Wollschlaeger*, 848 F.3d at 1321 (common word "harassment" found "incomprehensible" in context).  Plaintiffs do not argue that the word "participate" is *always* vague.  Context matters.  And the word "participate," in context, fails to help ordinary people understand what conduct is prohibited.

Proving the point, DeSantis cites (Br. 22 n.10) various other laws that use the word "participate" in contexts making clear that the arrested person must actually "participate" *in the violent and disorderly conduct*. *See, e.g.*, MODEL PENAL CODE § 250.1(1) ("A person is guilty of riot *** if he *participates with* [two] or more others in a course of disorderly conduct" and shares requisite intent) (emphasis added); ALASKA STAT. § 11.61.100(a) ("A person commits the crime of riot if, *while participating*

*with five or more others, the person engages in* tumultuous and violent conduct in a public place and thereby causes, or creates a substantial risk of causing, damage to property or physical injury to a person.") (emphasis added); DEL. CODE ANN. tit. 11, § 1302 (similar); HAW. REV. STAT. ANN. § 711-1103(1) (similar); N.J. STAT. ANN. § 2C:33-1(a) (similar); OHIO REV. CODE ANN. § 2917.03(A) (similar); 18 PA. STAT. AND CONST. STAT. ANN. § 5501 (similar). By using "participate" in a way that makes clear what conduct is prohibited, those laws underscore the vagueness inherent in Florida's contrasting approach.[15]

*Second*, the Legislature's use of "willfully" to modify "participate" does not help Defendants either. Under Florida law, "willfully" means "intentionally and purposely," *Dorsett*, 158 So. 3d at 562—not with a "conscious wrong or evil purpose," DeSantis Br. 23 (citing Black's Law Dictionary); *see also* MODEL PENAL CODE § 2.02(8) (defining "willfully" as "knowingly"). Significant protests often fill many city blocks. Before HB1, Plaintiff Dream Defenders hosted protests with more than 1,000

---

[15] The remaining cited statutes criminalize "participating in any riot" (or the like), and then define "riot," Okla. Stat. Ann. tit. 21, § 1312; Tenn. Code Ann. § 39-17-301; Tex. Penal Code Ann. § 42.02; 18 U.S.C. §§ 2101-2102, or use a different word, "engage." DeSantis Br. 22 n.10.

people.  Doc:65-1 at 4.  Even if a protestor knows violence is occurring *somewhere* within the protest, peaceful presence near the violence may mean only that the individual agrees with the message of the protest as a whole, not that she shares any violent intent.  Nor does use of the word "violent" provide notice that accused persons *themselves* must act violently.  *Cf.* DeSantis Br. 22-23, 29.  By "situat[ing] the riotous assembly of three or more persons within" the broader term "violent public disturbance," Doc:137 at 54, the Legislature made even non-rioting "participants" subject to arrest, *see* Williams Br. 19 (agreeing that "the violent actions of three people render an otherwise peaceful protest of 300 people a violent public disturbance").

*Third*, Defendants argue that, under "the last-antecedent rule," because the Legislature placed a comma after the phrase "three or more persons," the phrase "acting with a common intent" must be read to modify both the riotous "assembly" as well as the "person" at the beginning of the sentence.  DeSantis Br. 25-26; Williams Br. 12-13.  But that rule ordinarily (and logically) applies only where the court is "interpret[ing] statutes that include a list of terms or phrases followed by a limiting clause."  *Lockhart v. United States*, 577 U.S. 347, 351 (2016);

*compare, e.g.*, *F.T.C. v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959) (applying rule to limiting clause following list of parallel nouns, where no comma before limiting clause), *with Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169-1170 (2021) (declining to apply rule where limiting clause separated from list of parallel verbs by comma).  There is no such list here.  Although DeSantis's "best reading" (Br. 26) implies that the Legislature intended a parallel construction, the three participial phrases—"involving an assembly," "acting with a common intent," and "resulting in violence"—plainly do not all modify the antecedent "person." In fact, none does.[16]

Instead, "[w]hen the syntax involves something other than a parallel series of nouns or verbs," the more appropriate rule is the "nearest reasonable referent" canon, under which "a prepositive or postpositive modifier normally applies only to the nearest reasonable

---

[16] It is also (at best) awkward to describe a "person" and "an assembly" as acting with common intent to "assist each other," considering that the "assembly" does not have an intent—rather, its members do.  For that reason, Williams's asserted distinction between the phrases "each other" and "one another" is illusory (and does not "match the reality of common usage" or legislative usage in any event, *see* Doc:137 at 64-65).

referent." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012); *see, e.g.*, *United States v. Gillis*, 938 F.3d 1181, 1195-1196 (11th Cir. 2019) (interpreting the italicized language in the phrase "engage in conduct constituting a felony *that has as an element*," to modify only the immediately preceding word "felony"— not the more remote word "conduct"); *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1320-1321 (11th Cir. 2019) ("Every word that appears after 'a primary plan' is limited to modifying that noun and that noun only.") (citing Scalia & Garner, *supra* at 152). Under the nearest-reasonable-referent canon, the fact that a comma appears before the word "acting" makes no difference. *See, e.g.*, *Parm v. National Bank of Cal., N.A.*, 835 F.3d 1331, 1337-1338 (11th Cir. 2016) (holding that language set off by comma modified only nearest reasonable referent, not other clauses in same paragraph); *Goldberg v. Companion Life Ins. Co.*, 910 F. Supp. 2d 1350, 1353-1358 (M.D. Fla. 2012) (considering language "an amount equal to 3 times Your Annual Salary, up to $400,000," and reasoning that "up to $400,000" modifies "Your Annual Salary," not "amount," under nearest-reasonable-referent canon).

*Fourth*, Defendants rely on Subsection 7, which provides that "[t]his section does not prohibit constitutionally protected activity such as peaceful protest." FLA. STAT. § 870.01(7); *see* DeSantis Br. 20-21; Williams Br. 8-9. But Subsection 7 is the equivalent of a savings clause, which cannot "substantively operate to save an otherwise invalid statute." Doc:137 at 61 (quoting *CISPES v. F.B.I.*, 770 F.2d 468, 474 (5th Cir. 1985)). "Put another way, section (7) does nothing more than restate the constitutional avoidance canon," and therefore "cannot, on its own, render the statute unambiguous." Doc:137 at 61; *see, e.g.*, *Pryor*, 110 F.3d at 1545, 1550 (statute not susceptible to narrowing construction despite clause stating: "This section shall not be construed to be a prior restraint of the first amendment protected speech."); *see also Button*, 371 U.S. at 438 ("If there is an internal tension between proscription and protection in the statute, we cannot assume that, in its subsequent enforcement, ambiguities will be resolved in favor of adequate protection of First Amendment rights.").

Additionally, Subsection 7 may be read as an affirmative defense, which likewise cannot save a statute that infringes protected speech. When an "exception or proviso" such as Subsection 7 "is in a subsequent

substantive clause \*\*\* it is for the party for whom matter of excuse is furnished by the statute \*\*\* to bring it forward in his defence." *United States v. Cook*, 84 U.S. 168, 176 (1872). Subsection 2, as the general clause, states the full offense of rioting, while Subsection 7, an "exception or proviso," provides an affirmative defense that a criminal defendant may bring after being charged. Yet it "raises serious constitutional difficulties \*\*\* to impose on the defendant the burden of proving his speech is not unlawful," given that the "speaker must himself prove, on pain of a felony conviction, that his conduct falls within the affirmative defense." *Ashcroft*, 535 U.S. at 255; *cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 23-24 (2010) (rejecting vagueness challenge to word "service" within definitional proviso rather than affirmative defense). Indeed, the mere existence of Subsection 7 implies that Subsection 2 implicates constitutionally protected conduct—otherwise, no proviso would be necessary.

*Finally*, Williams's resort to the rule of lenity fails. Williams Br. 10. Although that canon is fully appropriate where a criminal defendant brings an as-applied challenge (as in Williams's cited case, *Polite v. State*, 973 So. 2d 1107, 1111 (Fla. 2007)), Williams cannot avoid a facial

56

challenge by arguing that state courts will tend to read a vague criminal statute in favor of the accused. *See Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 704 n.18 (1995) (declining to apply rule of lenity in facial challenge).[17]

In all events, because the ultimate "question is whether a person of ordinary intelligence can understand what the statute prohibits," "the canons of construction, while still relevant, take on less significance." Doc:137 at 50. The district court's exhaustive statutory analysis—not to mention the disagreement among Defendants themselves—shows that ordinary people cannot readily understand the scope of the crime. Needless to say, ascertaining that meaning is an especially acute concern for those evaluating whether exercising their speech, petition, and assembly rights is worth risking prison time. Because Section 15 fails to give ordinary people the opportunity to conform their conduct to the law

------

[17] Williams's reliance (Br. 11-12) on *Legacy Entertainment Arts Foundation, Inc. v. Mina*, No. 6:21-cv-698-PGB-DCI, 2021 WL 4444688 (M.D. Fla. Aug. 20, 2021) is also misplaced. That court resolved only "the extremely narrow issue of whether *these particular Plaintiffs* have standing to sue in *this particular case*," after concluding that their motion was "insufficiently briefed." Doc:137 at 81 & n.28.

and invites arbitrary and discriminatory enforcement, Plaintiffs are likely to succeed on their vagueness challenge.

### 2. The Statute Is Overbroad

Florida's new "riot" definition is also overbroad. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433. A statute is overbroad if it criminalizes "a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-119 (2003) (internal quotation marks omitted). "In making that determination, a court should evaluate the ambiguous as well as the unambiguous scope of the enactment." *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.6 (1982).

Properly construed, *see supra* pp. 35-42, the statute is overbroad. There is no "reasonable and readily apparent" reading that excludes those who merely attend protests "involv[ing]" violence—even if the individual neither participates nor intends to participate in the violence. The statute also appears to criminalize other protected expressive activity, such as willfully participating in a public disturbance by

"photograph[ing] or videotap[ing] police conduct" after violence erupts. *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *see* Doc:137 at 76. To be sure, the statute properly applies to much unprotected activity—for example, to those who engage in violence or whose inciting speech meets the *Brandenburg* standard. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). "But, in its ambiguity, it also consumes vast swaths of core First Amendment speech." Doc:137 at 75-76.

That is especially true because, when violence occurs at racial justice protests, it does so at no fault of the vast majority of the participants—and often as a result of outside agitators.[18] Plaintiffs know

---

[18] *See, e.g.*, Rachel Olding, *Far-Right Boogaloo Admits Shooting Up Cop Station Amid Floyd Protests*, DAILY BEAST (Oct. 3, 2021) (agitator "admitted he traveled from Texas to Minneapolis in the wake of George Floyd's death and purported to be a Black Lives Matter supporter while wreaking havoc on the city"), https://www.thedailybeast.com/far-right-boogaloo-ivan-harrison-hunter-admits-posing-as-blm-supporter-during-minneapolis-george-floyd-riot; Grace Huack, *Cars Have Hit Demonstrators 104 Times Since George Floyd Protests Began*, USA TODAY (July 9, 2020), https://www.usatoday.com/story/news/nation/2020/07/08/vehicle-ramming-attacks-66-us-since-may-27/5397700002/; Erica Chenoweth & Jeremy Pressman, *This Summer's Black Lives Matter Protesters Were Overwhelmingly Peaceful, Our Research Finds*, WASH. POST (Oct. 16, 2020), https://www.washingtonpost.com/politics/2020/

this firsthand.   White supremacists and agitators have spit on and attacked Plaintiffs' members at their peaceful protests on multiple occasions, even claiming HB1 supports their violent actions, Doc:137 at 77; purposefully driven through otherwise peaceful protests, Doc:65-1 at 7-8; and brandished a firearm, threatened protestors, and injured a demonstrator during a peaceful march, Doc:65-1 at 8.   These tactics are not new: 1960s Florida, for example, witnessed mass violence perpetrated against racial justice protesters, including the NAACP.[19] Section 15 is overbroad because it makes not only an actual rioter, but potentially every participant in a large protest that involves fringe violence, into a criminal.   *See Coates*, 402 U.S. at 614 n.4 ("Anyone could

_____

10/16/this-summers-black-lives-matter-protesters-were-overwhelming-peaceful-our-research-finds/.

[19] *See, e.g.*, Emily Bloch, *Civil Rights Protests Are Part Of Jacksonville's Past—And Future*, FLORIDA TIMES-UNION (June 6, 2020) (recounting Ax Handle Saturday on which 200 white supremacists attacked Black lunch-counter demonstrators), https://www.jacksonville.com/story/news/history/2020/06/06/civil-rights-protests-are-part-of-jacksonvilles-past---and-future/41740341/;   *St. Augustine, Florida*, Martin Luther King, Jr. Encyclopedia, STANFORD (discussing Klan counter-demonstration and violent provocation at 1964 St. Augustine racial justice protests), https://kinginstitute.stanford.edu/encyclopedia/st-augustine-florida#:~:text=Organized%20demonstrations%20reached%20St.,sit%2Dins%20against%20segregated%20businesses.

become an unwitting participant in a disorderly assembly, and suffer the penalty consequences.").

By allowing agitators to criminalize Plaintiffs' protected activities, Section 15 also permits "guilt by association," *i.e.*, criminalizing membership in a protest group without requiring the accused to share in the violent intent of others. *See Elfbrandt v. Russell*, 384 U.S. 11, 19 (1966); *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 908-909 (1982). HB1's co-sponsor even acknowledged that the statute would ensure criminal "responsibility is split amongst the group." Doc:65 at 29. Absent an injunction, "the lawless actions of a few rogue individuals could effectively criminalize the protected speech of hundreds, if not thousands, of law-abiding Floridians." Doc:137 at 77. The district court therefore properly held that Plaintiffs also have a likelihood of success on their overbreadth claim.

## B.    Without Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm

The loss of First Amendment freedoms "unquestionably constitutes irreparable injury." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d. 1261, 1271-1272 (11th Cir. 2006). Plaintiffs have already suffered specific harms to their respective missions from HB1, *supra* pp. 9-11, and

61

these harms are ongoing.  Plaintiffs reasonably fear that, without the injunction, they will not be able to hold demonstrations consistent with their respective missions (or they will do so at the risk of their members' arrest, with mandatory time in custody), at the expense of their members' First Amendment rights.  Doc:137 at 79.

DeSantis's only response is that Plaintiffs sought preliminary injunctive relief about three months after HB1's enactment.  (Williams does not challenge the district court's findings as to harm or the remaining injunction factors at all.)  But the reasonable length of time Plaintiffs took to "consider their options, prepare their lawsuit, and prepare their motion," Doc:137 at 80—while simultaneously briefing Defendants' motions to dismiss—does not indicate lack of harm. DeSantis identifies no case where three months between the passage of an omnibus bill and the filing of a preliminary injunction motion tackling serious First Amendment issues qualified as unreasonable delay.  In any event, there is no "general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for a preliminary injunction." *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979)

(fifteen-month delay acceptable); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211-1212 (10th Cir. 2009) (two-year delay acceptable).

As the district court found, this is a significant case where three months was a reasonable amount of time to prepare the preliminary injunction motion.  Doc:137 at 80.  That conclusion was well-supported by the record, and the district court certainly did not clearly err or abuse its discretion in "find[ing] Plaintiffs' explanation well founded."  Doc:137 at 80.

## C.    The Harm To Plaintiffs Outweighs Any Harm To Defendants, And The Injunction Is In The Public Interest

While operation of Section 15 severely chills the exercise of Plaintiffs' and their members' constitutional rights, Defendants will suffer no hardship from the preliminary injunction, as they "ha[ve] no interest in the enforcement of *** an unconstitutional statute." *Odebracht Constr., Inc. v. Secretary Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013); *see KH Outdoor*, 458 F.3d at 1271-1272.

Indeed, Defendants cannot claim to suffer harm, considering that the common law definition of "riot" will remain in place pending trial. Their argument that Section 15 merely codified (or clarified) the common-

law definition of "riot," effectively concedes they suffer no harm from a decision leaving that decades-old definition in place—particularly given the many additional laws that remain available to arrest and prosecute those who engage in rioting and other forms of violence. *See* Doc:137 at 83-84 & n.30.

DeSantis counters that a state suffers "irreparable" injury whenever it is enjoined by a federal court from enforcing a state statute. DeSantis Br. 36 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). It does not. There is "no harm from the state's nonenforcement of invalid legislation." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see Odebrecht*, 715 F.3d at 1289-1290 (harm to state from being prevented from enforcing likely unconstitutional law is "nebulous" and "ephemeral").

For similar reasons, the preliminary injunction is also in the public interest. Although DeSantis argues that the public interest favors waiting for Florida courts to decide this question—presumably at some point far in the future, after an individual is forced to risk prison time to test the law's constitutionality—"the public" also "has no interest in enforcing an unconstitutional law." *Scott v. Roberts*, 612 F.3d 1279, 1297

(11th Cir. 2010).    Besides, rewriting state laws infringes on the prerogatives of state legislatures; in contrast, assessing a state law's compliance with the U.S. Constitution is squarely within a federal court's jurisdiction and expertise.  *See England v. Louisiana State Bd. of Med. Exam'rs*, 375 U.S. 411, 415-416 (1964) ("[R]ecognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law.").

Affirmance also benefits the public because protest is essential to democracy and cannot continue freely with this statute in place.  *See Citizens United v. F.E.C.*, 558 U.S. 310, 339 (2010) ("Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people.").  The district court neither clearly erred nor abused its discretion in finding that the remaining factors favor Plaintiffs.

### D.    The District Court Did Not Otherwise Abuse Its Discretion In Granting An Injunction

As a last-ditch effort, Defendants argue that the district court should have abstained from interpreting the statute.  But federal courts have a "virtually unflagging obligation *** to exercise the jurisdiction given them."  *Colorado River Water Conservation Dist. v. United States*,

424 U.S. 800, 817 (1976). Abstention "is an extraordinary and narrow exception to [that] duty." *Id.* at 813 (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-189 (1959)). It is especially "inappropriate for cases such as the present one where *** statutes are justifiably attacked on their face as abridging free expression, or as applied for the purpose of discouraging protected activities." *Dombrowski v. Pfister*, 380 U.S. 479, 489-490 (1965); *see also Hill*, 482 U.S. at 467 ("[W]e have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment."). In such cases, "to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler v. Koota*, 389 U.S. 241, 252 (1967).

In *Baggett*, for example, the Supreme Court declined to abstain from deciding a vagueness challenge to a Washington statute that the Washington courts had never interpreted. 377 U.S. at 375. Although the Court recognized that a construction by "the Washington courts in light of the vagueness attack may eliminate the necessity of deciding the issue," it nevertheless declined to abstain absent "special circumstances"

66

justifying abstention. *Id.*; *cf., e.g.*, *Fields v. Rockdale Cnty. Ga.*, 785 F.2d 1558, 1561-1562 (11th Cir. 1986) (finding "exceptional circumstances" where case concerned matter of "land use planning primarily of local concern") (quoting *Frank Mashuda Co.*, 360 U.S. at 188-189).

The same is true here: Defendants point to no exceptional circumstances, and there are none. Forcing Plaintiffs to suffer the delay of state proceedings would only impose further First Amendment injuries. *See Baggett*, 377 U.S. at 375. Under Defendants' logic, vagueness challenges should rarely be adjudicated in federal court. The long history of facial vagueness challenges in this Court and the Supreme Court shows otherwise. *See, e.g.*, *Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 793 (2011); *Baggett*, 377 U.S. at 366; *Dombrowski*, 380 U.S. at 496; *Wollschlaeger*, 848 F.3d at 1323. This Court should exercise its jurisdiction and affirm.[20]

---

[20] There is also no good reason to certify the statutory interpretation question to the Florida Supreme Court. *See* DeSantis Br. 39 n.17. The U.S. Supreme Court has never required that federal litigants "await a state-court construction or the development of an established practice before bringing the federal suit." *Stenberg*, 530 U.S. at 945 (declining certification). Besides, "[c]ertification of a question (or abstention) is appropriate only where the statute is 'fairly susceptible' to a narrowing construction." *Id.* (citing *Hill*, 482 U.S. at 468-471). This statute is not.

## CONCLUSION

For the foregoing reasons, this Court should affirm the preliminary injunction order.

Dated:  January 27, 2022

Respectfully submitted,

s/ *James E. Tysse*

Georgina C. Yeomans (*pro hac vice*)
Jason P. Bailey (*pro hac vice*)
Anuja Thatte
NAACP LEGAL DEFENSE AND
  EDUCATIONAL FUND, INC.
709 14th Street NW, Suite 600
Washington, DC 20005

Sherrilyn A. Ifill
Samuel Spital
Rachel M. Kleinman
Morenike Fajana (*pro hac vice*)
NAACP LEGAL DEFENSE AND
  EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

Miriam Haskell
COMMUNITY JUSTICE PROJECT, INC.
3000 Biscayne Blvd. Ste. 106
Miami, FL 33137

Daniel B. Tilley
Nicholas Warren
ACLU OF FLORIDA
4343 W. Flagler Street, Suite 400
Miami, FL 33134

James E. Tysse
Pratik A. Shah
Steven H. Schulman
Juliana C. DeVries
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000
jtysse@akingump.com

Joseph L. Sorkin
Anne M. Evans
Christopher J. Gessner
Evan D.T. Frohman
Thomas V. Napoli
Jennifer J. Yu
AKIN GUMP STRAUSS HAUER &
  FELD LLP
One Bryant Park, 44th Floor
New York, NY 10036
Nicholas E. Petree
AKIN GUMP STRAUSS HAUER &
  FELD LLP
1111 Louisiana Street, 44th Floor
Houston, TX 77002

68

Pranav Lokin
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201

## CERTIFICATE OF COMPLIANCE

On behalf of Plaintiff-Appellees, I hereby certify pursuant to Federal Rule of Appellate Procedure 32(g)(1) that the attached brief is proportionally spaced, has a typeface of 14 points or more, and contains 12,967 words.

Dated:      January 27, 2022

s/ James E. Tysse
James E. Tysse

## CERTIFICATE OF SERVICE

I, James E. Tysse, counsel for Plaintiffs-Appellees and a member of the Bar of this Court, certify that on January 27, 2022, a copy of the foregoing was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

s/ James E. Tysse
James E. Tysse

# ADDENDUM

# TABLE OF CONTENTS

FLA. STAT. § 870.01 ............................................................ Add. 1

**Florida Statutes**

**Title XLVI. Crimes**

**Chapter 870. Affrays; Riots; Routs; Unlawful Assemblies**

**Section 870.01. Affrays and riots**

(1) A person commits an affray if he or she engages, by mutual consent, in fighting with another person in a public place to the terror of the people. A person who commits an affray commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

(2) A person commits a riot if he or she willfully participates in a violent public disturbance involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct, resulting in:

> (a) Injury to another person;

> (b) Damage to property; or

> (c) Imminent danger of injury to another person or damage to property.

A person who commits a riot commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(3) A person commits aggravated rioting if, in the course of committing a riot, he or she:

> (a) Participates with 25 or more other persons;

> (b) Causes great bodily harm to a person not participating in the riot;

> (c) Causes property damage in excess of $5,000;

> (d) Displays, uses, threatens to use, or attempts to use a deadly weapon; or

Add. 1

(e) By force, or threat of force, endangers the safe movement of a vehicle traveling on a public street, highway, or road.

A person who commits aggravated rioting commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(4) A person commits inciting a riot if he or she willfully incites another person to participate in a riot, resulting in a riot or imminent danger of a riot. A person who commits inciting a riot commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(5) A person commits aggravated inciting a riot if he or she:

(a) Incites a riot resulting in great bodily harm to another person not participating in the riot;

(b) Incites a riot resulting in property damage in excess of $5,000; or

(c) Supplies a deadly weapon to another person or teaches another person to prepare a deadly weapon with intent that the deadly weapon be used in a riot for an unlawful purpose.

A person who commits aggravated inciting a riot commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(6) Except for a violation of subsection (1), a person arrested for a violation of this section shall be held in custody until brought before the court for admittance to bail in accordance with chapter 903.

(7) This section does not prohibit constitutionally protected activity such as a peaceful protest.

Add. 2